IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**
OCT 18 2013
J T NOBLIN CLERK
BY_____ DEPUTY

M.C.Y., A MINOR,
BY AND THROUGH HIS NATURAL PARENTS
AND GUARDIANS JOSHUA M. YOUNGBLOOD
AND SHELLY D. YOUNGBLOOD                                          PLAINTIFF

VS.                                        CAUSE NO.: 1:13cv403 LG-JMR

GPCH-GP, INC. D/B/A GARDEN PARK MEDICAL CENTER
AND JOHN AND JANE DOES A; B; C; D; E; F; AND G                    DEFENDANTS

**COMPLAINT**
**(JURY TRIAL REQUESTED)**

COMES NOW the Plaintiff, by and through undersigned counsel, and files his Complaint against Defendant, GPCH-GP, Inc. d/b/a Garden Park Medical Center; and John and Jane Does A-G, and in support of his cause of action, shows the following:

**PARTIES**

1. Plaintiff, M.C.Y., a minor, by and through his natural parents and guardians Joshua Youngblood and Shelly Youngblood, is a minor child under six (6) years of age and a resident of Wichita Falls, Texas.

2. Defendant, GPCH-GP, Inc. d/b/a Garden Park Medical Center (hereafter "Garden Park"), is a Delaware company with its principal place of business at One Park Plaza, Nashville, Tennessee 37203, which is also doing business in the State of Mississippi as Garden Park Medical Center, and which committed a tort in the State of Mississippi, and can be served with process by service upon its Registered Agent for service of process, William E. Whitfield, III, P.O. Box 10, Gulfport, MS 39502-0010.

3. Defendants, John and Jane Does A-G, are individuals and/or entities who caused or contributed to the injuries of the Plaintiff, but whose identities, and the scope of their liability, are presently unknown to the Plaintiff. John and Jane Doe Defendants may include, but are not limited to, any and all employees and/or representatives of Garden Park, involved in any way in the purported care of M.C.Y., a minor; the true owner and/or operator of Garden Park, and/or any and all association(s) and/or business relationship(s) and/or business entities formed by and between the Defendants or any of them. Plaintiff will amend his Complaint to John and Jane Doe Defendants and describe their liability, when their true identities, and liability, are ascertained.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under the provision of Title 28, United States Code § 1332, in that this suit is a civil action between citizens of different States wherein the matter and actual controversy exceeds the sum value of $75,000.00, exclusive of interest and costs.

5. Venue in this civil action is appropriate in this Court pursuant to Title 28, United States Code § 1391, as a substantial part of the events or omissions giving rise to the claims of the Plaintiff occurred, and a substantial part of property that is the subject of this action is situated in the Southern Division of this Court specifically Gulfport, Mississippi.

## FACTS AND CAUSES OF ACTION

6. On or about August 14, 2011, Shelly Youngblood was pregnant at full term with her first child. In the early morning hours of August 14, 2011, Shelly Youngblood presented to the emergency department at Defendant "Garden Park" stating that her "water" had broken. At no time did any agent, employee, representative or other treating personnel in the emergency room

conduct any examination, test or procedure of Mrs. Youngblood to determine if Mrs. Youngblood's membranes had ruptured and/or her "water" had broken.

7. After presenting to the emergency department, Mrs. Youngblood was transferred by the emergency department staff of Garden Park to the Labor and Delivery Department at Garden Park. When she arrived in the Labor and Delivery Department, Mrs. Youngblood again informed the staff of Garden Park that her "water" had broken. At no time did any agent, employee, representative or other treating personnel in the Labor and Delivery Department conduct any examination, test or procedure to determine if Mrs. Youngblood's membranes had ruptured. Rather than conduct objective tests, Mrs. Youngblood was advised by Garden Park personnel that she had urinated on herself. She was then discharged and instructed to go home.

8. Later on in the evening of August 14, 2011, Mrs. Youngblood again presented to Garden Park with the same history of her "water" having broken many hours before. By this time, Mrs. Youngblood was having child labor contractions. Also at this time, the personnel of the Labor and Delivery Department conducted what is known as the "nitrazine strip test" to determine if Mrs. Youngblood's "water" had broken. It was determined at this time that Mrs. Youngblood's "water" had indeed broken. This was the first time that the "strip test" was administered to Mrs. Youngblood. It was determined at that time that all the amniotic fluid was gone. Mrs. Youngblood was admitted to the Labor and Delivery department.

9. Immediately after the first "nitrazine strip test" was done, Joshua Youngblood questioned the personnel of the Labor and Delivery Department regarding why the "nitrazine strip test" was not done when they first came to the Garden Park emergency department and the Labor and Delivery department many hours before. Joshua Youngblood was told by the female Head Nurse of Labor and Delivery that a "nitrazine strip test" had been done on their first visit. The

3

Head Nurse continued to attempt to convince Joshua Youngblood that he "misremember" what had occurred during their first visit to the emergency department and/or the labor and delivery department. Joshua Youngblood informed the Head Nurse that he did not "misremember" anything, and that the "nitrazine strip test" was not performed during their first visit to Garden Park's emergency department and/or the labor and delivery department prior to Shelly Youngblood being told she urinated on herself and was discharged to return home.

10. In the late night hours of August 14, 2011, Mrs. Youngblood was required to undergo an emergency C-Section because her child, M.C.Y., had been without amniotic fluid for many hours. As a result of the absence of amniotic fluid and the high risk of infection, infant M.C.Y. was immediately rushed to the NICU at Memorial Hospital Gulfport where he stayed for more than a week. While in the NICU, M.C.Y. underwent medical treatment including a spinal tap for treatment of any infection which he may have contracted because of the absence of amniotic fluid for many hours.

11. In the afternoon of August 15, 2011, while the Youngblood family was dealing with the admission of their infant son into the NICU at Memorial Hospital and at the same time dealing with the recovery of Shelly Youngblood from major abdominal surgery, the Head Nurse again confronted Joshua Youngblood and his family regarding the issue of the "nitrazine strip test". The Head Nurse continued to attempt to convince Joshua Youngblood and his family that a nitrazine strip test was done on the morning of August 14, 2011. The Head Nurse told Joshua Youngblood that she had personally checked the medical records for the morning of August 14, 2011 and that those records indicated that a "nitrazine strip test" was administered to Shelly Youngblood and at that time the results were negative for amniotic fluid. This same confrontation by the Head Nurse occurred on several occasions over the next several days while

Shelly Youngblood was recovering from her C-Section. Upon review of the medical records, no "nitrazine strip test" was administered to Shelly Youngblood on the morning of August 14, 2011 although Shelly Youngblood informed the emergency room department and labor and delivery department personnel that her "water" had broken. The Head Nurse knew or should have known that the representations she made contrary to the medical records were false. Since "nitrazine strip test" does not appear in the medical records for the morning of August 14, 2011, then it was not administered.

12. On or about August 18, 2011, Shelly Youngblood was discharged to her home from Garden Park.

13. On or about August 25, 2011, after spending 10 days in the NICU at Memorial Hospital, infant M.C.Y. was discharged.

14. In April, 2012, Joshua Youngblood requested the medical records for his infant son, M.C.Y., and for his wife, Shelly Youngblood. When Joshua Youngblood arrived at Garden Park to retrieve the requested medical records, he was informed by the staff of Garden Park that "someone would call him". After Joshua left Garden Park, he was contacted by telephone by a female who identified herself as the Chief Risk Officer for Garden Park. She told Joshua that she would like to meet with him regarding the events surrounding the birth of M.C.Y.

15. At the scheduled meeting between Joshua and the white female Chief Risk Officer, the Head Nurse of Labor and Delivery was also in attendance. During this meeting, the Chief Risk Officer and Head Nurse proceeded to "hot box" Joshua in an attempt to cover up the fact that a nitrazine strip test was not administered to Shelly Youngblood and to cover up the obvious breach of the standard of medical care committed by Garden Park and its personnel. The Chief Risk Officer and the Head Nurse told Joshua that on the morning of August 14, 2011 a "nitrazine

5

strip test" was done, but that Garden Park does not charge for the "nitrazine strip test". Joshua informed the Chief Risk Officer and Head Nurse that their statement was a lie because the Youngblood family was charged for the "nitrazine strip test" that was performed on their second trip to the hospital the night of August 14, 2011, when the Youngbloods were required to come back to the hospital after being sent home that morning. Joshua further informed the Chief Risk Officer and Head Nurse that the "nitrazine strip test" does not appear in the medical records for the morning of August 14, 2011. The Chief Risk Officer and Head Nurse knew or should have known that their representations contrary to the medical records were false. Since "nitrazine strip test" does not appear in the medical records for the morning of August 14, 2011, then it was not administered.

16. After Chief Risk Officer and Head Nurse realized that Joshua could not be intimidated by their misrepresentations and attempt to cover up the failures of Garden Park personnel, they then told Joshua that if he could not pay for the medical treatment for infant M.C.Y.'s stay in NICU, then the Youngblood family should apply for Medicaid. This statement was made to Joshua regardless of the fact that both the Chief Risk Officer and Head Nurse knew that Joshua was an employee with Hancock Bank and had health insurance coverage that may provide coverage. At that point, Joshua left the meeting disgusted with the attempt by Garden Park personnel to intimate, lie, misrepresent, and cover-up Garden Park's failures to comply with the standard of care, and further insult him.

17. At all relevant times, the agents, representatives, employees, and other treating personnel of "Garden Park" failed to examine, diagnosis, treat, administer, screen, supervise, resulting in overall breach(es) of the standard of care. At all times, the above referenced agents, representatives, employees, and/or individuals acted within the scope and course of such

employment and/or agency. As a result, Garden Park will be vicariously liable and/or individually liable for the negligent acts and/or omissions of the above referenced emergency room and/or treating personnel and/or their own negligent acts and/or omissions.

## COUNT I: NEGLIGENCE AND BREACH OF STANDARD OF CARE

18. Plaintiff re-alleges and restates the above allegations as if fully copied herein.

19. Defendant, and each of them, owed M.C.Y., a minor, a duty to exercise that standard of care required of minimally qualified medical providers with the same or substantially the same medical resources as were available in August 2011. Additionally, Defendant had the duty to render immediate and reasonable emergency medical treatment for the preservation of the life, limb and health of M.C.Y., a minor. Defendant had the duty to take reasonable care to prevent foreseeable injury to M.C.Y., a minor by providing competent emergency medical staff in its emergency room and labor and delivery department on August 14-15, 2011. Defendant breached its duties and standards of care owed M.C.Y., a minor. Such breaches proximately caused or contributed to the severe injuries and damages sustained and suffered by M.C.Y., a minor. These injuries include the following:

   a. Extreme physical pain and injury associated with failure to diagnose the loss of amniotic fluid many hours prior to his birth;

   b. Extreme physical pain;

   c. Mental anguish and emotional distress;

   d. Medical treatment, rehabilitation, and therapy;

   e. Past, present and future medical expenses, including but not limited to expenses for hospital bills, doctor care, treatment, rehabilitation, and medication;

   f. Loss of enjoyment of life; and

7

    g. Other damages and injuries to be shown at the trial of this matter.

## COUNT II: FAILURE TO SUPERVISE

20. Defendant had a duty to hire, employ, train, supervise, entrust, and retain skillful and competent employees and/or agents to provided medical services. Based on knowledge and belief, Defendant negligently and/or grossly negligently failed to hire, employ, train, supervise, entrust, and retain skillful and competent employees and/or agents to provide emergency medical services that complied with the applicable standards of care.

21. Further, Defendant had the duty to supervise the medical treatment rendered by the personnel of the emergency department and labor and delivery department to members of the public, including M.C.Y., a minor. Defendant, by and through its agents, representatives, and officers, negligently and/or grossly negligently failed to supervise the medical treatment rendered to M.C.Y., a minor.

22. It was foreseeable to the Defendants that the acts and omissions set forth in the preceding paragraphs would cause or contribute to cause serious injury or harm to members of the public, including the M.C.Y., a minor, and in fact, Defendants' said acts and omissions did cause and/or substantially contributed to cause M.C.Y., a minor to suffer severe injuries and damages as set forth throughout this Complaint.

## COUNT III: DAMAGES

23. Plaintiff re-alleges and restates the above allegations as if fully copied herein.

24. As a direct and proximate result of the Defendant's negligence, recklessness, and/or gross negligence, as set forth in each of the preceding paragraphs, Plaintiff demands from the Defendants, and each of them, the following damages:

    a. Any and all damages set forth in the preceding paragraphs;

8

b. Medical and pharmaceutical expenses, past, present, and future;

c. Compensatory damages for emotional distress, disability, lost wages, loss of wage earning capacity, and loss of enjoyment of life;

d. Past, present, and future Economic damages;

e. Punitive damages;

f. Incidental and Consequential damages, including attorneys' fees and expenses;

g. Pre and post judgment interest in an amount not less than 8% per year;

h. Any and all additional damages deemed allowable by this Court.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully demands trial by jury and respectfully requests that judgment be entered against Defendant GPCH-GP, Inc. d/b/a Garden Park Medical Center, and John and Jane Does A-G, individually, jointly and severally, for all actual damages, compensatory damages, and punitive damages as shown by the evidence, and that Plaintiff be awarded pre and post-judgment interest in the amount of 8% per annum and/or in such other amount as is determined by this Court; any and all attorneys' fees and costs of litigation; and all such other relief to which Plaintiff may be entitled.

Respectfully submitted, this the __18th__ day of October, 2013.

        M.C.Y., A MINOR, BY AND THROUGH HIS
        NATURAL PARENTS AND GUARDIANS
        JOSHUA M. YOUNGBLOOD
        AND SHELLY D. YOUNGBLOOD

By: _____
        DAVID N. HARRIS, JR (MSB# 100790)

Clyde H. Gunn, III, (MSB #5074)
Christopher C. Van Cleave, (MSB #10796)
W. Corban Gunn, (MSB #101752)
David N. Harris, Jr., (MSB #100790)
CORBAN, GUNN & VAN CLEAVE, PLLC
P.O. Drawer 1916
Biloxi, Mississippi 39533
Telephone:  (228) 432-7826
Facsimile:   (228) 456-0998

## **CERTIFICATE OF COMPLIANCE**

COMES NOW the undersigned counsel, in accordance with Section 11-1-58, and states that the undersigned attorney has reviewed the facts, and has consulted with an expert who is qualified to give expert testimony as to the standard of care or negligence, and whom the undersigned attorney believes is knowledgeable of the relevant issues and facts involved in this action. The undersigned attorney has concluded that on the basis of such review and consultation there is a reasonable basis for commencement of this action.

RESPECTFULLY SUBMITTED, this the 18th day of October, 2013.

_____
DAVID N. HARRIS, JR (MSB# 100790)